ELECTRIC VEHICLE CO. et al. v. C. A. DUERR & CO. et al.

(Circuit Court, S. D. New York. September 19, 1909.)

1. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—GASOLINE AUTOMOBILE.

The Selden patent, No. 549,160, for a road locomotive, granted in 1895 on an application filed in 1879, claims 1, 2, and 5, are all for combinations the elements of which were all old in some form, although changed, modified, and co-ordinated by the patentee to adopt them for harmonious action in such combinations, especially the "liquid hydrocarbon gas engine of the compression type," which constitutes the motive power and is the most important feature. At the time of the filing of the application, the art to which it relates, that of a self-propelled road vehicle with a considerable radius of action over ordinary highways and capable of management by a single driver, and he not necessarily a skilled engineer, had no practical existence, and the patent, which embodies all the parts of an operative vehicle of that kind, discloses invention of a primary character. As so construed, claims 1, 2, and 5 are infringed by the Ford machine, and claims 1 and 5 by the Panhard French machine.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 328.*]

2. PATENTS (§ 125*)—CONSTRUCTION AND OPERATION—EFFECT OF DELAY IN PATENT OFFICE.

That an applicant for a patent acquiesces in delay in the Patent Office is immaterial to the courts, and does not affect his rights under his patent. so long as the statute law is not violated.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 177; Dec. Dig. § 125.*]

In Equity. Suits by the Electric Vehicle Company and George B. Selden against C. A. Duerr & Co. and the Ford Motor Company, against the O. J. Gude Company, against John Wanamaker and others, against Société Anonyme Des Anciens Establissements, Panhard & Levassor, and Andre Massenat, and against Henry & A. C. Neubauer, for infringement of letters patent No. 549,160 for a road locomotive, granted to George B. Selden November 5, 1895. On final hearing. Decree for complainants.

Betts, Sheffield & Betts (Frederick P. Fish, William A. Redding, Samuel R. Betts, Edward Rector, and John W. Peters, of counsel), for complainants.

Coudert Bros., for defendants Panhard & Levassor and others.

Cardozo & Nathan (R. A. Parker, Frederic R. Coudert, W. Benton Crisp, and John P. Murray, of counsel), for defendants Ford Motor Co. and others.

HOUGH, District Judge. The application for the patent on which these actions are based, was filed in 1879, or more than 16 years before the grant was made. The principal claim in suit (No. 1) reads thus:

"The combination with a road locomotive, provided with suitable running gear including a propelling wheel and steering mechanism, of a liquid hydrocarbon gas engine of the compression type, comprising one or more power cylinders, a suitable liquid fuel receptacle, a power shaft connected with and arranged to run faster than the propelling wheel, an intermediate clutch or disconnecting device and a suitable carriage body adapted to the conveyance of persons or goods, substantially as described."

The second claim varies from the first only in requiring the "suitable carriage body" to be "located above the engine," while the fifth claim sets forth substantially the same combination, but specifically describes the engine as comprising a plurality of cylinders, with "pistons arranged to act in succession during the rotation of the power shaft."

These three claims are alleged to be infringed by all the defendants. This statement of complainants' position seems sufficient to show that the subject-matter of these suits is the modern gasoline automobile. The defendants are severally the manufacturer, seller, and user of the Ford machine, a well-known American make, and the maker and importer of the Panhard, a celebrated and typical French product. If these defendants infringe, it is because complainants own a patent so fundamental and far-reaching as to cover every modern car driven by any form of petroleum vapor and as yet commercially successful. Such a claim lends interest even to such a record as is here submitted, and requires careful examination, to the end that the parade of forces in this court may at least serve to shorten and simplify the certain conflict in the appellate tribunals.[1]

[1] NOTE.—It is a duty not to let pass this opportunity of protesting against the methods of taking and printing testimony in equity, current in this circuit (and probably others), excused, if not justified, by the rules of the Supreme Court, especially to be found in patent causes, and flagrantly exemplified in this litigation. As long as the bar prefers to adduce evidence by written deposition, rather than viva voce before an authoritative judicial officer, I fear that the antiquated rules will remain unchanged, and expensive prolixity re-

Upon one question of law all counsel are agreed. The patent claims under consideration are all for combinations. There is, of course, no agreement that the combinations set forth are patentable, and none as to the interpretation of their language, if valid at all; but there is no denial that in form nothing but combinations are claimed. This is emphasized, because it seems to open and simplify the discussion. Selden does not pretend to have invented any new machine or combination of matter, in the same sense that Whitney invented the cotton gin or Howe the sewing machine. He does not in application or claim specify any one mechanical device for which in some branch of art a prototype cannot be found. There had been and were in 1879 running gears, propelling wheels, steering mechanisms, gas engines, etc., of many forms, and his patent covers no one form of any of these parts of his "road locomotive." He does assert that he selected, adapted, modified, co-ordinated, and organized the enumerated parts (including the usual mechanical adjuncts of each part) into an harmonious whole, capable of results never before achieved, and of an importance best measured by the asserted fact that after 30 years no gasoline motor car has been produced that does not depend for success on a selection and organization of parts identical with or equivalent to that made by him in 1879. If this be true, it may be held at once that in such a mental operation, and such an important result therefrom, invention, and that of a high order, undoubtedly does reside. Where Bradley, J., declined definition, he would be a bold man who tried it; but I am sure that invention is easily discernible as that which vitalizes Selden's selection, if that selection and its results have been truly described.

main the best-known characteristic of equity. But reforms some times begin with the contemplation of horrible examples, and it is therefore noted that the records in these cases, as printed, bound, and submitted, comprise 36 large octavo volumes, of which more than one-half contain only repeated matter; i. e., identical depositions, with changed captions, and exhibits offered in more than one case. In reading the testimony of one side in one set of cases, there were counted over 100 printed pages recording squabbles (not unaccompanied with apparent personal rancor) concerning adjournments, and after arriving at this number it seemed unnecessary to count further. In many parts of the record, there are not 5 consecutive pages of testimony to be found without encountering objections stated at outrageous length, which may serve to annoy and disconcert the witness, but are not of enough vitality to merit discussion in 2,000 pages of briefs. Naturally tempers give way under such ill-arranged procedure, and this record contains language, uncalled for and unjustifiable, from the retort discourteous to the lie direct. (E. G. Ford, C. R. pp. 2873, 2967, 2968, 2987, 2988.) And all this lumbers up the court record room, while clients pay for it! Even when evidence in equity was taken by written answers to carefully drawn interrogatories, the practice was not marked by economy or celerity; but stenography and typewriting, the phonograph and linotype, have become common since our rules were framed, have made compression and brevity old-fashioned, increased expense, and often swamped bench and bar alike by the quantity, rather than the quality, of the material offered for consideration. Motions to expunge and limit cross-examination should have been made in these cases, though they are feeble remedies, exposing counsel to personal reproach, and rendering judges afraid of keeping out of evidence what they cannot (on motion, at all events) understand. But the radical difficulty, of which this case is a striking (though not singular) example, will remain as long as testimony is taken without any authoritative judicial officer present, and responsible for the maintenance of discipline, and the reception or exclusion of testimony.

Broadly speaking, the defense in these cases rests on a denial of the truth of the foregoing summary of Selden's performance, which denial has two parts: (1) Selden did not do what he now asserts; and (2) defendants' combinations differ from Selden's, being neither identical nor equivalent. In considering what Selden did, and the meaning of the words in which he described and claimed his achievement, it is to be remembered that whether his combination constitutes invention and whether it possesses novelty and utility are primarily questions of fact, as to which the very grant of the patent raises a presumption in favor of complainants, while the demurrer decision (in Electric Vehicle Co. v. Winton Motor Co. [C. C.] 104 Fed. 814) is here controlling authority to the effect that on its face, plus all matters of which the court can take judicial cognizance, the patent is valid. To ascertain, therefore, how far defendants have succeeded in meeting the burden of proof, which in all matters of fact lies on them, it seems fair to begin by discovering from all the evidence what was the state of the art when Selden filed his application in 1879.[2]

But what is the art as to which this inquiry is to be made? On this preliminary point it seems to me that defendants' testimony and argument have taken too wide a range, or at least laid undue emphasis on matters of little moment. This invention does not belong to the steam engine art, nor that of any engine, regarded alone; nor is it fruitful to examine carefully the development of traction engines, whether primarily designed to haul "trailers," or transport persons and goods over their own wheels. Boats, also, and tram cars, propelled by engines of any kind, furnish but a limited field for useful investigation. The inquiry is: How stood art (and science too) in 1879, in respect of a self-propelled vehicle with a considerable radius of action over ordinary highways, and capable of management by a single driver, and, he not necessarily a skilled engineer? Or, to use a phrase frequently occurring, in the testimony and exhibits, what was known of the "horseless carriage" industry in 1879, either at home or abroad?

The answer given by the evidence is entirely plain: There was no such industry, the art existed only in talk and hope, no vehicle even faintly fulfilling the requirements above outlined had ever been built, and there is no competent and persuasive evidence that any experiment had ever moved 100 feet, or revealed an organization warranting the expectation that it ever would do so. Some examination of the kindred arts, above alluded to, serves to explain this situation. For more than 100 years steam as a prime motor had dominated the world of mechanic art. Steam as the power for a self-propelled road vehicle had been exhaustively worked over, and patents obtained, from Trevithick (British 2,599, of 1802) to Monnot (U. S. 197,485, in 1877); and the result was the traction engine. It made no difference whether it carried passengers or hauled freight. The actual type and only type was a boiler on wheels, of enormous weight, slow speed, and small radius of action. But the numerous experiments with steam road wagons had (how-

[2] NOTE.—From uncontradicted testimony, 1877 might well be fixed as the date of the invention alleged in this patent application. The experts, however, have throughout spoken of the art of 1879 as controlling, and that time is therefore taken as a convenient starting point.

ever meager the success attending them) served to make known to that wholly ideal and fictitious person, "the man skilled in the art," something of the organization of any road vehicle capable of operation by a small crew. Steering mechanism, operated by wheel before the driver, independent turning of the fore wheels, the chain drive, as well as beveled gear connection between power and driving shafts, devices for disconnecting power from running gear and letting engine run free, plans for brake control of quite a modern sort, and stowage of motive power in parts of the vehicle remote from passengers—all had been practiced or suggested. From patents and publications scattered over two continents and more than two generations there can be reconstructed (and defendants have done it on paper) something that is very far from even a good theoretical road wagon, but which does contain most of the elements of Selden's combination; and this represents the art, known to the man skilled in both theory and practice, a good mechanic, with a scientific education and widely read in the technical literature of all civilized nations, by whose incredible knowledge the achievements of patentees are so often measured. Obviously, if a fairly good road wagon cannot be reconstructed in 1909 out of materials so industriously collected from the scattered knowledge of 1879, it is desirable to ascertain whether there then existed some one lack, whether the art then required some one thing which was wholly missing, in order to produce a practical self-propelled road vehicle.

It seems to me plain that there was such lack, and it may be stated in the language of one of the numerous inventors who procured long and elaborate patents relating to road locomotion, and never (so far as this record shows) did anything more. Savalle (French 77,644, in 1867) says in a certificate of addition dated March 16, 1869:

"I have tried to apply to road locomotives several motors operating by air expanded by the heat produced, either by the explosion of gas or by air forced over a metallic surface, heated by coal or other combustible, or also by petroleum. These divers forms of motors apply perfectly when it concerns the traction of omnibuses or other large vehicles of this kind; but when it is necessary to apply this kind of locomotion to light carriages, only carrying one to six persons, or to drive a velocipede, these means become impracticable by the large space which they require."

The lack, the something that had to be supplied before it was worth while to organize the vehicle, was the engine. Steam had thus far failed, and this record seems to show that at about the time Savalle wrote the gas engine as a road wagon motive power began to be mentioned in serious publications, and patent specifications.[3] Savalle was much mistaken in asserting that any of the assorted motors mentioned by him had successfully driven an omnibus or any similar conveyance; but he early hinted at the truth that in some form of motor actuated by a product of petroleum would be found, if not the immediate solution

---

[3] NOTE.—In making this statement Le Monde Illustré and Pinkus (British 8,207, of 1839) have not been overlooked. The former proves nothing that relates to the form of engine to be considered in this litigation, while the absence of all later mention proves the car a sporadic failure. Pinkus was speaking of tram cars, and the use of such a publication against Selden by the Patent Office was, to say the least, not very intelligent.

of the problem, at least the missing element that would make the solution sure.

This missing element Selden avers he discovered, and it follows that over his engine the conflict in these cases has raged through several volumes. In trying to ascertain, however, the status in 1877–79 of engines in any way resembling Selden's, the court is fortunate in having in evidence a book entitled "The Gas Engine" published in 1885 by Mr. Dugald Clerk, who has also testified with admirable clearness as an expert for complainants. It appears that the materials for this book were gathered during the very period of Selden's experiments, while so completely has Clerk furnished a classic on the history of the gas engine art that even counsel, who sharply criticise his evidence, support their arguments from his book to such an extent that it is not too much to say that many chapters thereof could be reconstructed from their briefs.

In 1879 "internal combustion" engines were well known, and had reached a considerable degree of commercial success, despite the fact that the reasons for their success or more frequent failure were very ill understood. The fact that fuel might be burned in the engine cylinder itself, that such burning (if of gases) produced an expansion thereof, and that such expansion might be utilized by allowing it to push the piston, was and is the basic proposition. This knowledge had produced the Lenoir engine in 1860 and the Hugon in 1865, constructed in close adherence to the steam engine of the day, and giving less than one horse power per ton of weight. Both normally used illuminating gas at atmospheric pressure. The Otto free piston engine of 1867 marked an advance in effectiveness, but no form of gas engine had yet appeared which (so far as shown) was more than suggested as the propulsive power of a road wagon. In 1861 Million, and a year later Beau de Rochas, Siemens, and others, pointed out the advantage of compressing the gaseous fuel before ignition, in order that the expansion should be both greater and quicker, with the greatest possible pressure at the beginning of the expansive movement; and in 1872 Brayton in America, and in 1876 Otto in Europe, introduced compression engines, the latter with great commercial success.

The change from a gaseous fuel burning at atmospheric pressure to the same fuel burned under compression was a change of kind; for, though formed of the same chemical elements, the compressed fuel possessed a power, when used by men who live by breathing atmospheric air, that uncompressed and commercially possible gases did not and could not exert in any noncompression engine even as yet imagined. It therefore seems clear that the phrase "compression type," as applied to internal combustion engines, is reasonably indicative of a class, and appropriately describes an unmistakable and invariable species of the genus gas engine.[4]   The evidence is persuasive that the increasing

4 NOTE.—Compression is a relative word. Men can for short periods live and work in a caisson where the air is compressed; but a Lenoir engine, if it could operate in the caisson, would be a noncompression engine still, though using the air of its immediate environment. It is density of fuel, as compared with the air into which the engine exhausts, that determines and defines compression. This seems overlooked in some of defendants' cross-examination (Clerk, X-Q. 156–163), and neglected in some portions of their argument.

success of the gas engine, produced in the middle '70's of the last century, repeated dreams (they are no more) of applying a gas engine to a road wagon. In 1877 Rosenwald (French 116,871) made a picture of a brougham having an Otto free piston engine perched in an apparently insecure position between passenger and driver. His is a paper patent only, and is in my opinion clearly shown to be inoperative for reasons of which one only may be mentioned: The most improved type of Otto engine then known weighed over half a ton per horse power. He did not use the most improved type, and did not propose any improvement or modification which would have prevented his brougham from going to pieces at the first jar of his motor.[5] This patent is the suggestion nearest to Selden, and is mentioned for comparison hereafter.

Although by 1879 internal combustion engines had separated into the compression and noncompression classes, they were (and still are) all known as gas engines, irrespective of the condition of their fuel immediately before the work of preparing it for combustion begins. The term originated, doubtless, when coal gas was the only gaseous fuel known; but the vapor of petroleum or of any product thereof (gasoline or petrol) is just as much a gas as another, and 30 years ago there was, and there is now, no distinction, generally obtaining, between engines whose fuel as ordinarily purchased is coal gas, and those using gasoline or crude petroleum, provided that what ultimately burns in the cylinder is that vaporous substance, "capable of expanding indefinitely"—which is gas.[6]

But if the substantial difference between compression and noncompression engines was known and recognized, certain other terms of art which have been far too much used in this litigation were nonexistent in 1879. A great superstructure of argument has been built upon the difference between "constant pressure" and "constant volume" engines. These terms appear to have been devised by Mr. Clerk, and first used in his book before alluded to, as convenient phrases useful in studying the operation of engines and classifying their phenomena. The terms are instructive, as is the separation of nouns into declensions and verbs into conjugations; but much of the argument about the words attaches an undeserved importance to them. In all internal combustion motors, the result of expanding the burning gaseous fuel is to drive the piston; that is, the cylinder chamber in which the expanding gas is confined gives way on the piston side (so to speak). If the piston head offers no more resistance than will permit it to move under the expansive force produced by the initial compression alone,

[5] NOTE.—Hilton & Johnson (British 10, of 1878) and Roberts (British 711, of 1877) are provisional only. If these patentees were not able to complete their own inventions, this court cannot be expected to perceive them. Menn (French 118,109, in 1877) is at best an impossible gas engine, in a structure irrelevant to this case.

[6] NOTE.—Encyc. Brit. (9th Ed., 1878–1889) vol. 6, p. 310. It is curious and instructive that this publication contains no reference at all to road locomotion by gas engines. Under "Steam Engines" (volume 22, p. 522), see Lenoir, Brayton, Otto, and Clerk treated under the subhead "Gas Engines." This article was evidently written in 1886–87, immediately after the publication of Clerk's book, which is referred to.

evidently, since the piston moved under that pressure, it will be maintained to the end of the stroke, the expansion produced by ignition serving to keep up that "constant pressure." If, however, the compressed charge must be ignited before the piston moves, then whatever volume thereof is introduced into the cylinder increases (by combustion) its pressure on the piston head before the engine operates, and the machine is described as "constant volume." In both phrases "constant" refers to condition, at the instant piston movement begins, compared with that at the moment the fuel charge is inserted. If between the two moments pressure increases, then the volume is constant; while, if volume increases, pressure is constant. These conditions are theoretic. If in a constant pressure engine the load or piston resistance is suddenly increased, the expansive power produced by compression alone may not start movement before ignition or explosion; and accordingly (if too much importance be attached to phrases) the type of engine has changed. Of course, nothing of the kind has occurred. The relation of piston head to cylinder walls relative to time of explosion has changed, and it may nowadays (in many engines) be changed at will to suit load and speed by throttling and by timed ignition. These variations have been observed in all the engines testified about in this case. They occur, or may occur, in all compression engines, and are no more significant of specific or generic differences than are variations in rapidity of breath in different men, or in the same man at different times.

From this attempted outline of the knowledge and achievements of 1879, it seems to me that the way was singularly clear for any one who would really produce the thing described in Selden's first claim. Success is never anticipated by any number of failures, and when it is clearly kept in mind that what Selden claims is a combination, and not any one of its elements, the defendant's references to prior patents and publications may be thus finally disposed of so far as this court is concerned.

Much has been said concerning this inventor's personality, and there is some importance therein, as showing the likelihood of his comprehending his own experiments and telling the truth about them. The record shows him always interested in mechanical pursuits, receiving an appropriate education for the theoretical side thereof, but not himself a skilled practical mechanician. His application for a patent on a rubber tire wheel, made in 1869, is significant and interesting, and in view of quite recent litigation in this circuit instructive. Taking his evidence in connection with his letters and notes, he is shown especially attentive to traction problems from his early manhood. I am persuaded that he carefully studied Brayton's engine and understood it practically; but his knowledge of the theory of thermodynamics seems fairly illustrated by a remark to his workman, Gomm, when his original engine turned over: "We have struck a new power." There is no satisfactory evidence that before application filed he knew thoroughly anything of Otto's compression engine. All this was not a very complete equipment; but he had the true inventor's enthusiasm, and for more than five years (as the Chief Justice said of Morse, in 15 How. 108, 14 L. Ed. 601) "he pursued these investigations with unre-

mitting ardor and industry, interrupted occasionally by pecuniary embarrassments."

When he was ready to file his application, he had completed and experimentally operated one cylinder of a three-cylinder engine of the general type Brayton had patented in 1872 and 1874. He intentionally built a plurality of cylinders, to obviate or minimize the necessity for a fly wheel. He produced an inclosed crank case (which immediately reduced weight to an enormous extent), and used a small piston with a short stroke (which made possible the speed that would compensate for the loss of piston head area). This engine, with allowance for adjuncts Selden did not use, but (as experience has shown) should have used, weighed less than 200 pounds per brake horse power, as compared with over 800 pounds in the lightest form of Brayton's, and is capable of over 500 revolutions per minute, as against less than 250 by any type of gas engine known, built, or suggested in 1879. These I find to be the facts regarding the engine built by Selden before application filed. He then caused to be made a model and mechanical drawing of his suggested vehicle and actual engine, and submitted the same, with specification and claims, to the Commissioner of Patents.

Avoiding for the present the language of his original application, and the effect of the numerous changes therein during its many years in the Patent Office, was the thing fairly revealed by the model and drawings, and conceived under the circumstances above set forth, the embodiment of a combination patentable in 1879? I think the answer is, emphatically, "Yes;" that which is not obvious to skillful men is usually (as remarked by Mr. Clerk in his evidence) invention, and certainly what Selden shows in his model, and by the drawings, which have remained unchanged for 30 years, was anything but obvious. The inventive act is shown by comparing Selden and Rosenwald. If the latter's brougham had actually carried its engine, and traveled even a little, he might nevertheless (on defendants' own argument) have found his patent invalid by American law, because each part of his vehicle was doing just what it had always done, without any new "co-operative law," while his engine in particular was the same motor which, before it was applied to the brougham, had perchance driven a lathe and might to-morrow do something else. Rosenwald might have been held a mere aggregator (however successful); but Selden's combination cannot be taken apart, and each element recognized as something that had done the same thing or sort of thing before. The adaptation of the engine alone was something never before attempted (so far as shown). Such adaptation might have involved an infringement on Brayton; but that did not prevent Selden's combination from being strikingly new, useful if it would work, and eminently patentable.

To sum up what is shown to have been the mental concept embodied in 1879 by Selden's model and drawings: With Brayton's engine in mind, he organized a new road vehicle. To be sure, he did substitute one old and well-known prime mover (gas) for another (steam); but in so doing he devised and used an arrangement of Brayton's engine never before attempted, one that Brayton himself never suggested, made, or patented, and without which the road vehicle was an impossibility. This mental concept constituted invention, if capable of

reduction to operation, and if any operative example (not all operative examples) thereof was shown by the patentee. If this doctrine be admitted or found, defendants, before attacking the operativeness of Selden's vehicle, seek to limit the scope of the patent by asserting that the combination is not infringed by any vehicle whose engine is not substantially identical with that described in drawings and specifications, notwithstanding the language of the claim "liquid hydrocarbon gas engine of the compression type."

Thus it is asserted that, since Selden and Brayton show a spray of petroleum mixed with and carried by compressed air into the combustion chamber, they do not show a true gas engine; that the use of a carbureter separate from the engine proper, and producing gaseous mixture which it feeds to the engine, is something outside the patent and avoiding infringement; that a water jacket, being shown by Selden in a peculiar and unusual equivalent or attempted equivalent, is something outside the combination, and when used by defendant differentiates defendants' engine and combination from anything that infringes; and that, since Selden evidently shows in his drawings ignition by a constant flame, he is confined thereto, and cannot use electric ignition, while defendants, by using the same, do vary the combination. I have already tried to show that Brayton's petroleum engine, Lenoir's illuminating gas engine, and an Otto machine driven by gasoline, are now, and were in 1879, not only "gas engines" in the sense that they all operate on the same scientific principles, but they were known as and called "gas engines," by those best qualified to speak. To make gas in one place rather than another must be an immaterial variation, where a primary patent (such as this by complainants' contention) is under consideration. Water jackets were old in 1879, and had been used in many forms, and both flame and electric ignition had been used and were well known to gas engineers of the day, although in 1879 it seems to me that the flame method was by far more successful than the electric as applied to compression machines.

The force of these objections, based on the face of the drawings and specifications, as compared with the claims, depends on whether the patent is viewed as a primary or pioneer one, or the contrary; and this in turn depends on the state of the art at the time of invention. The art I have attempted to describe at perhaps too great length, because upon its condition this whole litigation seems to hinge. If I have correctly apprehended it, there was clearly room for a pioneer patent; and it must now be held that on its face, and in view of the art, Selden's is such a patent. This means that Selden is entitled to a broad range of equivalents, and this rule as applied here results in this crucial inquiry: Was Selden (or any one else) entitled in 1879 to appropriate as one of the elements of any patentable combination a "liquid hydrocarbon gas engine of the compression type"?

I think he was, and so was any other inventor; but he was the first so to do. If this be true, then the use or disuse of any then well-known mechanical appliance, which will increase the efficiency, usefulness, or commercial success of such combination, without changing what de-

fendants call its co-operative law,[7] is on the one hand open to Selden, and on the other will not free defendants from infringement. Although there were in 1879 many liquid hydrocarbon gas engines of the compression type, there was not one which in its then form could be made an element (and the most important element) in a road wagon combination, and the radical difficulty was the same that Savalle had confessed to 10 years before. Selden on paper certainly—whether actually will be considered later—solved that difficulty, and such solution gave him the right to claim broadly the thing which was the leading element in his invention, when used in his combination. Thirty years have passed, and counsel admit that no successful gasoline motor car fails to use a liquid hydrocarbon gas engine, of the compression type, with a short rapid stroke, and inclosed crank case, and a plurality of cylinders.

These are the very things which are at the foundation of success. To be sure (as will be considered more fully later) no very great degree of success can be reached without improvement over 1879 in carbureters and electric ignition, and increase of knowledge concerning the respective mechanical possibilities of two, four, and six cycle engines. The faster, also, the reciprocating parts of an engine move, the greater the necessity of constant and abundant lubrication, and Selden's lubrication is confessedly primitive; and, finally, the great difference between any results Selden's most optimistic supporter can claim for him in 1879, and the successes of 1909, arises from increased compression, so that engine weight per brake horse power has now been reduced to about 10 pounds. But these are nonessential, if in 1879 Selden could lawfully use as an element in his patentable combination the "compression type" or species of a whole genus of engines. As already stated, I think he could and did, and further showed and made an exemplar of said "type."[8]

---

[7] NOTE.—This phrase, which runs through all defendants' argument, seems to be defined (Main Brief p. 157) as "a new mode of operation," referring to Rapp v. Central, etc., Co. (C. C.) 158 Fed. 440. It is insisted that Selden's combination introduced no new "co-operative law," and must therefore fail. The trouble with this argument is that there never was such a combination as Selden's before 1879, and there is nothing to compare it with but paper projects and admitted failures. The same phrase is repeatedly used when quoting Ex parte Faure, 52 O. G. 752. If Selden had merely utilized Brayton's existing engine to drive a wagon, the doctrine of the case cited might have applied. Perhaps it would have been good American law against Rosenwald; but if Selden selected. adapted, and united old elements to produce a new result, the phrase is inapplicable.

[8] NOTE.—As quite possibly my foregoing efforts to follow defendants' argument on the interpretation of the specification and claims in the combined light of prior and present art have failed of complete success, the following statement may be excused: Defendants seem continually to assume (without saying so) that Selden invented nothing more than a modified Brayton engine, and then assert that they do not infringe, because they do not use that particular motor, and do use a modified Otto. They admit that the claim is for a combination, but continually seek refuge in defenses that would be good against any patent on Selden's engine,-but are worthless against the combination if it be patentable at all. Mr. Selden is a member of the bar, especially devoted to patent causes. He seems to have been his own solicitor during most of his contests with examiners over this application, and the clearly and simply

Thus far the claims and specifications have been treated as though they were presented to the Commissioner in 1879, in the shape they left his office in 1895. This was not the case. Nothing remained in 1895 of the language of 1879 but the description of the vehicle and engine (and not all of that). The claims were reworded and the specification amplified many times, and usually, after a rejection made or criticism offered by the examiner, Selden did nothing by way of amendment or reply for about two years—the extreme limit of inactivity permitted him by the then rules of Patent Office practice. By these means he received in 1895 a patent for an invention of 1879, and in the meantime had never built a motor car, and never succeeded in getting any one sufficiently interested in his theories to experimentally try them out with larger means and better mechanical ideas than Selden himself had.

During the later years of this period, and while Selden was in very leisurely fashion combating examiners who evidently had small conception of what was meant by light self-propelling vehicles usable on the common roads, Duryea, Olds, Ford, and others in America, and the Panhard and Pêugeot Companies (and many others) in France were experimenting with actual cars, and in 1894 a public race meet was held in France, whereat cars now as archaic in appearance as Selden's demonstrated that they actually could propel themselves from Paris to Rouen at about 12 miles an hour. The engines of some of them were modified Ottos, and "liquid hydrocarbon gas engines of the compression type," and it must be found that when Selden's patent issued there had been developed engines answering to his phrase, which as matter of history are not derived from his engine—that others reached his type without knowledge of him or his labors. Indeed (while certainty is impossible) it is my belief from this evidence that Selden has contributed little to motor car advancement in the United States, and nothing at all abroad. As matter of fact, I believe that nearly all the cars made in the United States when these actions began were modeled on French ideas, and used engines descended from Otto through Daimler, and not from Brayton through Selden or any other American. In short, this American patent represents to me a great idea, conceived in 1879, which lay absolutely fallow until 1895, was until then concealed in a file wrapper, and is now demanding tribute from later independent inventors (for the most part foreign) who more promptly and far more successfully reduced their ideas to practice. But the patent speaks from the date of its issue, and unless Selden did something unlawful during his 16 years' wrangle with examiners, or unless intervening American rights, available to defendants, sprang up while Selden was rewording claims, he is within the law, and his rights are the same as those of the promptest applicant.

worded claims in suit are good professional work. He has avoided the trap into which Morse fell (O'Reilly v. Morse, 15 How. 62, 14 L. Ed. 601), and thereby lost most of the fruits of his efforts. This case seems to me suggestive, in that the Chief Justice several times speaks of "process" as legally synonymous with "combination." And see Morse's claim restated so as to avoid the criticism that destroyed it in 19 Harv. Law Review, p. 37. I think Selden might have patented his engine as an improvement on Brayton; but he would have had to pay Brayton a royalty, and these suits would certainly never have been possible.

Without prolonging discussion, it may be held briefly that Selden did not overstep the law. He did delay. He was not in a hurry. He could not get any one to back him, and doubtless appreciated that, if he was ahead of the times, it was wise not to let his patent get ahead, too. If he had gotten his grant in 1880, without a moneyed backer, the patent might and probably would have expired, or nearly so, before any one saw its possibilities; and, if the business world had seen them within 17 years, that term would then so nearly have expired that Selden would never have been able to get to final hearing before it ran out. At best, an accounting and not an injunction would have been his lot. The difference he may well have considered as a lawyer, and personally I believe he did think of it. If he did not delay unlawfully, what intervening rights did he permit to spring up?

Remembering that Selden clearly showed a "liquid hydrocarbon gas engine of the compression type" in 1879, and actually manufactured one, I think it clear that his original claim was wider than any of those in suit. The third claim as originally filed read thus:

"The combination in a road locomotive provided with suitable running gear and steering mechanism, of a gas engine, traction wheels, and an intermediate clutch or disengaging device, substantially as set forth."

It is true that throughout the original papers he speaks continually of "gas engine L," that being the alphabetical designation given his motor in the drawing submitted; but the claim quoted shows how wide was his original demand, and without further elaboration I hold, with complainants, that all subsequent changes of claim are in diminution or contraction of this first statement of invention. The file wrapper, cross-examination thereon, and argument concerning it form a bulky volume; but it seems to me sufficient to quote from the amendment of June 6, 1889, when Selden amplified his specification by inserting the following:

'I have succeeded in overcoming these difficulties by the construction of a road locomotive propelled by a liquid hydrocarbon engine of the compression type, of a design which permits it to be operated in connection with the running gear, so that the full carrying capacity of the body of the vehicle can be utilized for the transport of persons or goods, and which, by dispensing with skilled attendance and with steam boilers, water, water tanks, coal, and coal bunkers, very largely reduce the weight of the machine in proportion to the power produced, and enables me, while employing the most condensed form of fuel, to produce a power road wagon which differs but little in appearance from, and is not materially heavier than, the carriage in common use, is capable of being managed by persons of ordinary skill at a minimum of trouble and expense, and which possesses sufficient power to overcome any usual inclination."

And at the same time he put what is now claim 1 into substantially its present shape. The language last quoted is in the final specification, it describes the thing which Selden conceived and pictured in 1879, and in 1889 the man skilled in the art, though he knew more than he did in 1879, did not know as much as Selden sets forth in the quoted words. It was still possible for the gasoline compression engine to be made part of a patentable road wagon combination. No one in the United States had passed, or even caught up with, Selden, while foreign efforts have been fairly and attractively told by Mr. Krebs of the

Panhard Company. He quite fully depicts the history of meritorious and successful efforts in road locomotion apparently as ingenious as Selden's and more vigorously pursued; but they did not begin until after 1879, and in 1889 were still clearly behind Selden's concept.[9]

Defendants have advanced many other arguments based on the contents of the file wrapper. Thus the original third claim, above set forth, declares a combination in a road locomotive, while the first claim in suit covers a combination with a road locomotive. The change is declared to be an abandonment of the original combination. It is further shown that some patent examiner rejected certain claims, referring to the Pinkus patent, supra, and thereupon Selden amended the claims and disavowed and disclaimed Pinkus. The argument based on this is that, since Pinkus' "co-operative law" is the same as Selden's, the disclaimer of Pinkus was in effect an abandonment of the very combination now relied on. I have already indicated my view of the major premise of the last proposition; but these arguments, and many others of the same ilk, cannot prevail if it be true that Selden clearly showed in 1879 the thing he had invented. If so, he could rewrite the description of that thing as many times as the rules of practice permitted down to 1895. That such rewriting is all Selden did I believe to be true.

Defendants now urge that Selden's invention is inoperative. The one-cylinder engine built by Selden on the three-cylinder casting in 1877–78 was put in evidence as Exhibit 47. Thereafter the cylinders of Exhibit 47 were all bored out or rebored, new working parts fitted to them, and the engine put into a vehicle, the whole called Exhibit 89, completed in the winter of 1905–06, and constituting the first physical embodiment of Selden's patent. The complainant licensee, Electric Vehicle Company, also constructed a new engine from the patent drawings (Exhibit 132) and a complete vehicle (Exhibit 157). Defendants aver that neither of these vehicles is a Chinese reproduction of Selden's drawings, and have devoted volumes of print to recording and arguing about the performances of Exhibit 89. In my opinion Exhibit 89 as constructed was such Chinese reproduction. Exhibit 157 was not; complainants having changed the water cooling device, used only electric ignition, and made some other departures from the mechanical details shown in the drawings. But these variations were (as previously indicated) within the range of equivalents permitted to a primary patent.[10]

---

[9] NOTE.—It is not intended to admit or assert by this that, even if some one had between 1879 and 1889 devised an engine or a combination, which if devised in 1869 would have been a clear anticipation of Selden, such person's device would be a defense to these suits. The fact that no such device exists renders discussion of this point unnecessary. Benz has not been overlooked, but is not thought to require further mention.

[10] NOTE.—Great complaint is made of the "destruction" of Exhibit 47, and after defendants learned of the construction of Exhibit 89, they frequently demanded that Exhibit 47 be produced, knowing that it could not be done. I can see no force in the complaint; the function of an exhibit is to furnish evidential information, and it is too obvious for argument that whatever value (it is not much) Exhibit 47 has, it was enhanced by building even the rebored cylinders into Exhibit 89. It may also be noted here that in my opinion Sel-

The evidence on the subject of operativeness is the most flagrant example of unsupervised testifying I have ever seen or heard of. Whether in 1905 Exhibit 47 was any better than scrap, whether Exhibit 89 would start on flame ignition, whether Exhibit 132 showed diagrams revealing volume or pressure constant, were perhaps interesting, but unimportant, questions. They raised a false issue, over which months of time and volumes of print have been expended. The serious, and I think only, question was, and is, whether a machine made in substantial conformity to drawings and specifications, without going beyond the range of equivalents permitted, was operative, even though rudimentary. Exhibit 157 answers to this description, and its performances may, I think, be thus summarized: It is a wretchedly poor car for 1905; there were probably as good, if not better, cars in 1895; but it is a marvel of invention for 1879. And that is more than enough for the purposes of these cases.

One instance of alleged prior use remains. Before 1879 Brayton undertook to furnish an engine which would drive an omnibus to certain men in Pittsburg. It is shown that he endeavored to adapt his then well-known engine to traction purposes. That he failed utterly is clearly proved. The reasons for his failure are not so clear; but the failure is enough to invalidate the defense.

No litigation closely resembling these cases has been shown to the court, and no instance is known to me of an idea being buried in the Patent Office until the world caught up to and passed it, and then embodied in a patent only useful for tribute. But patents are granted for inventions. The inventor may use his discovery, or he may not; but no one else can use it for 17 years. That 17 years begins whenever the United States so decrees by its patent grant. That the applicant for patent rights acquiesces in delay, or even desires delay, is immaterial to the courts, so long as the statute law is not violated. On these principles complainants are entitled to a decree.[11]

den's original drawings indicate the existence of a check—or wicket-valve in the appropriate place. It was a well known and perfectly simple mechanical adjunct, it should have been there, it was by no means the key of the invention, and Rebasz' testimony is probable and uncontradicted.

The so-called Ford-Lenoir machine has received attention. To me it is interesting but irrelevant. Mr. Clerk did intimate that he doubted whether any vehicle with a noncompression engine could move at all. Mr. Ford has shown that he was mistaken. By making the engine four times the size of Ford's compression type, there is obtained about one-seventh of the power. It hardly seems that the pleasure of contradicting Clerk was worth so much trouble.

[11] NOTE.—The legal principles relied on are so simple (the difficulty being only with the opinion evidence) that it has not seemed necessary to quote from decisions. The leading cases considered are (as to nature and act of invention) Smith v. Dental Vulcanite Co., 93 U. S. 486, 23 L. Ed. 952; Loom Co. v. Higgins, 105 U. S. 580, 26 L. Ed. 1177; Potts v. Creager, 155 U. S. 597, 15 Sup. Ct. 194, 39 L. Ed. 275; (as to probative value of references) Seymour v. Osborne, 11 Wall. 516, 20 L. Ed. 33; (as to meaning of "pioneer" patent, and effect of file wrapper) Hobbs v. Beach, 180 U. S. 383, 21 Sup. Ct. 409, 45 L. Ed. 586; (effect of delay in Patent Office) U. S. v. Bell Telephone Co., 167 U. S. 224, 17 Sup. Ct. 809, 42 L. Ed. 144; (right to deny use to others while patentee not using) Continental Paper Bag Company v. Eastern Paper Bag Company, 210 U. S. 424, 28 Sup. Ct. 748, 52 L. Ed. 1122.

The Panhard machine does not, in my judgment, infringe the second claim. Construed as they have been in this opinion, infringement of claims 1, 2, and 5 by the Ford machine, and of 1 and 5 by the Panhard, can hardly be said to be denied.

It is so found, and decrees will pass accordingly.