## A. R. MOSLER & CO. v. LURIE.

(District Court, S. D. New York. October 28, 1912.)

1. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—IGNITER FOR GAS, OIL, OR VAPOR ENGINES.

    The Canfield patent, No. 612,701, for an igniter for gas, oil, or vapor engines, *held* valid, but limited to the particular forms illustrated therein, and, as so limited, not infringed.

2. PATENTS (§ 289*)—SUIT FOR INFRINGEMENT—LACHES.

An assignee of a patent is affected by the laches of former owners, and a delay of eleven years before the bringing of a suit for infringement, or making any use of the patent, during the greater part of which time numerous other manufacturers were in good faith expending money in producing the alleged infringing devices, and during part of which complainant (on its theory) was an infringer, constitutes such laches as will bar the right of the complainant to relief.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 467–469; Dec. Dig. § 289.*]

In Equity. Suit by A. R. Mosler & Co. against John Lurie, trading as the Auto Supply Company, for infringement of letters patent No. 612,701, for an igniter for gas, oil, or vapor engines, granted to Frank W. Canfield October 18, 1898. On final hearing. Decree for defendant.

William A. Redding and William B. Greeley, both of New York City, for complainant.

Emerson R. Newell, Isaac B. Owens, and Fred E. Tasker, all of New York City, for defendant.

MAYER, District Judge. The invention claimed relates to the means for igniting the explosive charge of gas or hydrocarbon vapor in internal combustion or explosive engines, such as are commonly used for the propulsion of automobiles and small boats, and various other purposes.

[1] This is now almost universally accomplished, in engines of the character referred to, by an electric spark which is formed at the proper instant between two electrodes, which are situated within the explosion space of the engine and are connected with a suitable source of electric energy. It is contended that the invention covered by the patent in suit relates to ignition devices of this kind, and more especially to ignition devices of this kind as applied to compression engines, in which the charge of gas or vapor is compressed before ignition. As is well known, there are two systems of electric ignition —the "make and break" and the "jump spark." The invention here claimed belongs to the "jump spark" system.

To understand the problem of ignition which Canfield endeavored to solve, it is necessary, of course, to ascertain, if possible, the state of the prior art. Canfield began his experiment in 1895 at Manistee, Mich., applied for letters patent in August, 1897, and obtained them in October, 1898.

Dugald Clerk is regarded by many as the leading expert in the world on internal combustion engines. His work, "The Gas and Oil Engine," was accepted in this circuit as authority in the noted Selden patent litigation, and he is spoken of as one who has testified "with admirable clearness" as an expert. Electric Vehicle Co. et al. v. C. A. Duerr & Co. (C. C.) 172 Fed. 923; Columbia Motor Car Co. et al. v. C. A. Duerr & Co. et al., 184 Fed. 893, 107 C. C. A. 215. The eighth edition (1896) of the work referred to is in evidence. From Mr. Clerk's observations, it abundantly appears that the prob-

lem of ignition in the compression engine was far from solution, that the electric methods were "at best uncertain," and that much remained "to be accomplished before flame is as completely and effectively under control as steam." Clerk's "The Gas and Oil Engine," pp. 202, 205, 225.

Canfield manifestly understood the difficulties referred to by Clerk and set about to overcome them. In March, 1895, the Manistee Iron Works Company, apparently a reputable concern, began to build an engine at the instance of Canfield. This engine was finished in the summer of 1895, and had at first a plain head with fiber plugs. In this original head, experiments were made with mica, fiber, and soapstone insulators. Later, in February, 1896, other heads (Complainant's Exhibits, Engine Heads, Feb., 1896, R and L) were made by the Manistee Works; the engine then having, in the heads, soapstone plugs, with recesses around the electrodes, and this engine, with these heads, was operated in the shops of the Manistee Works for about 30 days in the spring of 1896.

The evidence satisfactorily establishes that the engine shown in complainant's exhibits (photographs Nos. 1, 2, 3, and 4) was used in March, 1896, with the heads referred to (Engine Heads, Feb.. 1896, R and L), and that Canfield suggested and directed the making of the insulators in these heads around the electrodes as shown in the exhibits. These dates are important, because of the defense of prior use of a plug, called in this suit the "Raabe plug." The evidence as to this prior use is, to say the least, not convincing; but, in any event, the Canfield structure was a month ahead of the Raabe plug.

We must now examine the claims of the patent, which are as follows:

"1. In a gas, oil, or vapor engine igniter or sparker, a recess or counter bore around the electrode or electrodes, and above its or their sparking points when said electrodes are used vertically, for the purpose of preventing an injurious accumulation of the products of combustion or other foul matter on the insulation of said electrodes, substantially as and for the purpose set forth.

"2. In a gas, oil, or vapor engine igniter or sparker, a recess or counterbore of such size and depth as to prevent the explosive mixture used in the cylinder from circulating into said counterbore or recess far enough to come in contact with its deepest part around the electrode or electrodes at or near the point where said electrode or electrodes leave the insulator to enter the cylinder or firing chamber, for the purpose of preventing an injurious accumulation of the products of combustion or other foul matter on the insulation of said electrodes, substantially as and for the purpose set forth.".

Complainant differentiates these claims, urging that claim 1 applies to all of the figures of the patent drawings, not only to those in which that part of the electrode within the recess is bare, but also to those in which that part of the electrode within the recess is itself covered with insulation, while claim 2 is applicable only to those forms in which that part of the electrode within the recess is bare. It is alleged that six spark plugs (Complainant's 1–6) infringe, and under this interpretation all would infringe claim 1, and four (Complainant's 1–4) would infringe claim 2.

This construction of the claims seems to me to be strained and antagonistic to the clear import of the language employed; and, if there be any doubt as to the meaning of that language, resort to the file wrapper will resolve that doubt in favor of the contention of defendant, that there is nothing to limit claim 2 to a tubular wall of insulation spaced from the electrode.

Briefly stated, then, Canfield believed that he had found a method of insulating the electrodes of gas, oil, or vapor engines that would not foul injuriously, but be at all times in reliable working order, and he claimed as his invention the recess or counterbore around the electrodes, deeper than it was wide, and upon that claim his patent must stand or fall.

Defendant insists that this claim was fully anticipated in the prior art, and he has introduced in evidence a considerable number of prior patents and publications. The only one which is debatably close is the structure shown in "Schöttler's 'Die Gasmaschine.'"

Fortunately I am aided in this case by the tangible existence of what Judge Hough has called that wholly ideal and fictitious person, "the man skilled in the art." 172 Fed. 923. If the solution of the problem was not revealed to Dugald Clerk by "Die Gasmaschine," I am sure I cannot discover it. "Die Gasmaschine," was published in 1890. Clerk wrote of the problems of ignition in 1896. He was undoubtedly thoroughly familiar with Schöttler's work, for in his preface to his first edition (1886) he expresses his indebtedness to Professor Schöttler, among others. In his 1896 book, Clerk shows that he has continued to study and analyze Schöttler's contributions to this art and science (pages 180, 253, 256) and, surely, if "Die Gasmaschine" had made disclosure, Clerk would never have indulged in the observations hereinbefore referred to.

We thus find Canfield in 1895 having an idea which had not been anticipated. Did that idea take practical form, so as to enable the man "skilled in the art" to make an operative structure; and did that idea, as stated in the patent, disclose the information necessary to the manufacture of the modern alleged infringing spark plug (Exhibits 1–6)?

There is no disclosure in the patent of what material the insulation should be, nor how to keep it tight, nor how to prevent the destruction of the plug by the heat. As defendant's expert says:

"It is very evident from the specification that the patentee's conceptions were theoretical merely, and that he viewed the matter from the mechanical side only, and had no idea whatever of the electrical nature of the problem. Thus the matter which is, most of all, fundamental, and without which no structure could succeed, namely, the nature of the material, is not referred to at all, and there is no insulating material known to me which could possibly be used successfully in the patentee's construction. Again, the fundamental matter of mechanical construction, such as the prevention of leakage, and the allowance for expansion, is neither referred to in the specification nor provided for in the drawings. I refer here to the leakage of gases under the working pressures. Again, the patentee gives no information whatever as to how oil is to be prevented from working into and around the insulation, and, by carbonizing, destroying its insulating value."

Complainant's expert (distinguished in this art), in his prima facie testimony and prior to the testimony as to the use of soapstone, suggested porcelain and mica as the insulating material. It is clearly shown that mica was impracticable. So was fiber. So was soapstone, until soaked with lard, baked, and then shrunk in.

I am satisfied that the theory of defendant's expert as to porcelain is right. He testified that, if porcelain is to be exposed to high temperature, it cannot be practically made in large masses (such as Canfield's patent may be deemed to have suggested), without certain destruction by the heat. (D. R. 132.)

Defendant's expert explains the success of the modern spark plug as follows:

"The use of porcelain as an insulator in the modern spark plug is successful, at the present time, only because the joint efforts of the porcelain makers and the spark plug manufacturers have resulted in qualities of porcelains and modes of mounting which enable the porcelain to expand and contract freely and hold it in such a manner that the part clamped has a small mass to give rise to disruptive internal strains. * * *"

Complainant's expert attempted to explain away these defects by saying (page 392, C. R.):

"I am of the opinion that porcelain could have been employed successfully in large masses without packing, if the method of construction had been used as that employed with the soapstone insulation, even in spite of its hard and brittle nature."

In other words, if the porcelain was soaked in oil, baked, and then ground off and shrunk into the heads, as was done with the soapstone, the porcelain might have been made to work; but nothing of this nature is mentioned in the patent.

Defendant could not be expected to know anything about soapstone, or shrinking it in, or treating it with lard oil and baking it, all of which were necessary in the Canfield device, as none of this information was contained in the patent, but came out for the first time on the rebuttal proofs. Following merely the patent, and what was known in the art at the time, defendant made an engine head (Defendant's Exhibit "Canfield Cylinder Head"), also three porcelains such as shown in the drawings, which have been introduced as Defendant's Exhibits "Canfield Insulators" Nos. 1, 2, and 3, and tried them out exactly as described in the patent. As they were not shrunk into the head, but followed the patent exactly, they broke. Further experiments were made by complainant, but these only served to confirm the contentions of defendant.

Further reference might be made to the testimony in support of defendant's position on this branch, but enough has been pointed out to indicate that the spark plugs in suit (Exhibits 1–6) do not infringe, and that the patent must be limited to the particular forms which Canfield illustrated.

I am not unmindful of the argument that Canfield did his work in the early stages of the art to which his invention belongs; but spark plugs, though called by other names, were known to the art, and, had Canfield found the secret of an operative structure, he could

have expressed it in simple terms. I think the evidence establishes that the modern operative spark plug with porcelain insulation was only made practicable through the joint efforts of the porcelain makers and the spark plug manufacturers, as hereinbefore described.

[2] There is, however, another, and it seems to me, fatal, bar to a decree in favor of complainant. After Canfield's death (some time prior to 1901) the patent was assigned a number of times, until it was acquired by complainant in March, 1909. As far back as 1901, the Torbensen Gear, Incorporated, was putting on the market, in a comparatively large way, the plug described in evidence as the "T. G. I. plug." In February or March, 1904, the Rajah Auto Supply Company (which had bought the spark plug business of the Torbensen Company) began putting on the market the Rajah plug (Complainant's Exhibit 5). In August, 1904, the Olds Motor Works, of Detroit, per a Mr. Whittemore, notified the Torbensen concern that they controlled letters patent 612,701, and that the Torbensen Company was infringing the Canfield patent. Neither the Torbensen nor Rajah Companies ceased manufacture (D. R. 62 and 63), nor was suit begun. It will be observed that this notice did not come from a poor inventor, or his executor, but from automobile manufacturers.

Mezger's plug (Complainant's Exhibit 1) has been on the market since about 1902. Mezger obtained a patent in 1902. (D. R. 78, 305.) The plug (Complainant's Exhibit 6) has been on the market since about 1902. Other alleged infringing plugs have been on the market since about 1906, 1907, or 1908. This very complainant has had a plug (Mosler spitfire) on the market since 1902 or 1903, and that plug (if complainant is right now) infringed the Canfield patent. Many other plugs have been on the market, which might possibly have infringed this patent, if complainant is right. Nowhere does it appear that the slightest effort has been made to stop the alleged infringing, unless it be the sending of the letter on behalf of the Olds Works, and that went no further.

The Association Patents Company owned this patent from 1906 until it was assigned to complainant in 1909. There is nothing to show that Association Patents Company manufactured or marketed spark plugs made under the Canfield patent. I gather from the record (C. R. 496) that Association Patents Company is some sort of a corporation that deals in patents and licenses, and I find that complainant company was desirous, among other things, "of acquiring all damages and profits recoverable by said Association Patents Company from any and every party for any and every infringement of said 'letters patent,' and each of them, and all claims and demands for such damages and profits." (C. R. 500, 501).

It is stated in complainant's brief (page 1):

"Although it does not appear on the record, in so many words, that John Lurie is a nominal defendant, and that the defense of this suit is carried on by manufacturers of the infringing spark plugs, that such is the fact is a natural inference, and one that will not be disputed, for among the spark plugs, the sale of which by John Lurie is complained of in the bill of complaint, are the spark plugs of certain well-known manufacturers in the United States, and the defendant has been represented throughout the proceedings

in this case, prior to the final hearing, by no less than three able counsel, who are not associated in business, and who happen to represent regularly two of these manufacturers of the alleged infringing spark plugs."

I presume this statement is correct, and that defendant's counsel will not controvert it. The suit, thus, is really against the manufacturers; but, whether against them or not, defendant and others have been notoriously selling these goods to a large extent for a number of years. (D. R. 79.)

Here, then, we have a situation where nothing was done by the patentee or his assigns for eleven years, while others risked their money in putting on the market an improved and very important device in an industry which has developed by leaps and bounds, and which has revolutionized travel for utility and pleasure. While the public has been getting the benefit of the use of the devices, and of competition between manufacturers, the assignees of this patent have sat supinely by, not even bringing one suit against any one of many open alleged infringers.

Then comes along an ex-infringer (on its own theory), who has bought the rights under this and another patent, and asks a court of equity to fill its treasury with license fees and damage money. It is no excuse that complainant obtained its title only in 1909. Its claim is affected by the laches and the want of equity of its assignors.

The defense of laches is not tested by time alone. Lapse of time may be well explained; but, on the other hand, even a comparatively short time may constitute laches when the conduct of the slothful is such as to induce others, in good faith, to expend money and take the risks of enterprise.

I think this defendant, and the manufacturers of the goods in question, have acted in good faith, in the belief that the patent was of no, or, in any event, doubtful, validity, and they were justified in that belief by the inertia of the assignees of this patent, which nonaction was strongly suggestive of lack of confidence in the validity of the patent.

The court would go a long distance to protect the inventor, who is ahead of his times, and who, unable to interest capital, finds that some one has stolen the fruits of his genius. But that is not this case. This case falls rather within the principles stated by Judge Coxe in Richardson v. Osborne (C. C.) 82 Fed. 95, affirmed 93 Fed. 828, 36 C. C. A. 610.

The patent is sustained within the limits here indicated, and it is held that there is no infringement. The bill is dismissed, with costs.

Settle decree on five days' notice.